### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JACOB RABINOWITZ, :<br> :<br>Plaintiff, :<br> :<br>v. :<br> :<br>ST. JOSEPH'S REGIONAL HIGH SCHOOL, :<br>ROMAN CATHOLIC ARCHDIOCESE :<br>OF NEWARK, :<br>Defendants, :<br> :<br> : | **Civil Action No. 18-16498 (JXN) (ESK)**<br><br>**OPINION** |

**NEALS**, District Judge:

This matter comes before the Court on the motion for summary judgment [ECF No. 63] filed by St. Joseph's Regional High School ("SJR") and the Roman Catholic Archdiocese of Newark ("RCAN") (collectively, the "Defendants"), to which an opposition [ECF No. 66] was filed by Jacob Rabinowitz ("Plaintiff") and a reply [ECF No. 68] was filed by Defendants.  Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and venue is proper pursuant to 28 U.S.C. § 1391.  The Court has carefully considered the parties' submissions and decides the matter without oral argument under Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b).  For the reasons set forth below, the motion for summary judgement [ECF No. 63] is **DENIED**.

## I.   BACKGROUND[1]

---

[1] Facts cited are drawn from Defendants' Statement of Material Facts (ECF No. 63-1), Plaintiff's Counterstatement of Material Facts (ECF No. 66-2), and the evidence cited therein.  A fact is considered "undisputed for the purposes of the motion" if it is admitted or unchallenged, or if a party "fails to properly address another party's assertion of fact as required by Rule 56(c)" of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 56(e).

Plaintiff is a Jewish individual who was hired to teach mathematics at SJR during the 2017-2018 school year.  ECF No. 66-2 ¶¶ 1-2; ECF No. 63-1 ¶ 7.  RCAN is a Catholic organization that is responsible for administration of the school.  ECF No. 66-2 ¶ 63.  Plaintiff alleges that Defendants created a hostile work environment in violation of Title VII of the Civil Rights Act ("Title VII") and the New Jersey Law Against Discrimination ("NJLAD").  ECF No. 63-1 ¶¶ 1-4.

At the start of the school year, Plaintiff began to experience issues in the classroom.  During the first week, Plaintiff noticed a swastika carved into the chalkboard in his classroom.  *Id.* ¶ 10; ECF No. 66-2 ¶ 9.  Likewise, Plaintiff's classroom was adorned with swastikas on desks and a bookshelf, and the German phrase "six million was only the beginning" and the words "Jew faggot" were written on desks.  ECF No. 66-2 ¶¶ 15, 17-18, 25; ECF No. 63-1 ¶ 13.  Plaintiff could not identify any students, however, who drew graffiti in the classroom.  ECF No. 63-1 ¶ 20.

In addition to graffiti, Plaintiff experienced incidents with students during class.  For example, students threw coins at Plaintiff while his back was turned to the class.  ECF No. 66-2 ¶ 20.  The incident was discussed among students in other classes, and at least one student was under the impression that the coin-throwing occurred because of Plaintiff's Jewish identity.  *Id.* ¶¶ 22-23.  Students also blew kisses at Plaintiff, told him they loved him, and called him "cute."  ECF No. 63-1 ¶ 40; ECF No. 66-2 ¶ 28.  Additionally, a student in Plaintiff's class stood on a desk and mimicked the murder of a Jewish person from the film *Schindler's List*.  ECF No. 66-2 ¶ 24.  Plaintiff did not impose any discipline on the student in connection with the incident.  ECF No. 63-1 ¶ 21.  Although Plaintiff imposed discipline in other

instances and communicated with parents and the SJR administration regarding student misbehavior, he did not mention any anti-Semitic incidents.  *Id.* ¶¶ 15-16, 18-19.

A few months into the school year, SJR administrators began to observe Plaintiff's class.  In December 2017, Math Department Chair Joseph Kievitt sat in on Plaintiff's class, provided criticisms of Plaintiff's performance, and noted that "some students appeared confused" and that Plaintiff "did not appear to be aware of the environment in the classroom" around him.  *Id.* ¶¶ 24-26.  Principal Michael Bruno and Vice Principal Stephen Roberts also visited Plaintiff's class during the school year.  ECF No. 66-2 ¶¶ 37, 41-42; ECF No. 63-1 ¶ 17.  Mr. Bruno made periodic visits, including a February 2018 sit-in where he offered criticisms of Plaintiff's performance and concluded that students were "not at all engaged."  ECF No. 63-1 ¶¶ 31-34; ECF No. 66-2 ¶ 42.  In their observations, Mr. Kieveitt, Mr. Bruno, and Mr. Roberts did not recognize any anti-Semitic graffiti or conduct.  ECF No. 66-2 ¶¶ 37, 40-42.  Similarly, two additional teachers used Plaintiff's classroom during the school year, including President Brian Donnelly, but neither teacher did anything about anti-Semitic graffiti.  *Id.* ¶¶ 10-11, 38-39.

On February 8, 2018, the SJR administration decided to transfer one of Plaintiff's classes to another teacher.  ECF No. 63-1 ¶ 28.  The decision was made at a meeting between Plaintiff and Mr. Bruno.  *Id.*  The day after the meeting, Plaintiff wrote to Mr. Bruno about "what the implications [would] be for [his] employment [at SJR the] next year."  *Id.* ¶ 29.  Plaintiff invoked his "positive experience with the four math classes which [were] high achieving and without discipline problems," noted the "understanding [he had] gained of the unique culture at Saint Joseph," and indicated that he "would very

3

much like to stay." *Id.* Mr. Bruno's sit-in and criticisms of Plaintiff's performance occurred the following week, on February 13, 2018. *Id.* ¶ 31.

In response to Mr. Bruno's criticisms, Plaintiff reported the anti-Semitic graffiti and conduct to the SJR administration. In March 2018, Plaintiff sent Mr. Bruno two letters, one of which described the swastikas, the German slogan, the coin-throwing, and the reenactment of the scene from *Schindler's List*. ECF No. 66-2 ¶¶ 54-56; ECF No. 63-1 ¶¶ 37-38. The letter also attached photos of the swastikas, explained that the behavior had been ongoing since the start of the school year, and requested that SJR take appropriate remedial action. ECF No. 66-2 ¶ 57; ECF No. 63-1 ¶ 38, 43. In the letter, Plaintiff claimed that he kept silent about "the continuous barrage of anti-Semitic actions" because he "feared signaling [him]self as a 'trouble-maker' and a 'problem' immediately after [he] began work at [SJR]." ECF No. 63-1 ¶ 39; ECF No. 66-2 ¶ 56. Plaintiff had reviewed the Faculty Handbook, which contained anti-bullying and anti-harassment policies like those in the Student Handbook, as well as complaint procedures and policies that required employees to report discrimination and to refrain from retaliation. ECF No. 63-1 ¶¶ 57, 59-62, 64-66. But Plaintiff did not report or cover up the swastika because he needed the job, "wanted to seem hardworking and uncomplaining" as an employee, and did not want to "draw attention" to the symbol. ECF No. 66-2 ¶¶ 12-13. Although Plaintiff was in shock and initially tried to dismiss the students' behavior as adolescent practices, he increasingly became demoralized about the state of anti-Semitism at SJR, including when Mr. Bruno sat in his classroom, gave him a negative review, and failed to recognize the presence of swastikas. *Id.* ¶¶ 12, 45-46, 48-49.

4

On the same day that Plaintiff reported the anti-Semitic graffiti and conduct, Mr. Bruno responded in writing. ECF No. 63-1 ¶ 44. In his response, Mr. Bruno noted that "[i]t was only after [Plaintiff] received [the] observation report that [he] brought these concerns to [Mr. Bruno's] attention, and it was even weeks after [Plaintiff] received the report" that he raised these concerns. *Id.* ¶ 46. Mr. Bruno suggested that anti-Semitism was "taken extremely seriously by the administration" but that SJR could not "fix problems that [it was] unaware even exist[ed]." *Id.* Mr. Bruno invited Plaintiff to discuss his concerns further and instructed Plaintiff to report future issues to Mr. Roberts, "as had been the policy all year." *Id.* ¶¶ 46-47. However, Mr. Bruno also responded to Plaintiff's allegations of anti-Semitism by suggesting that the letter was "a direct reflection of [his] inability to manage a classroom" setting, and SJR soon notified Plaintiff that it would not renew his contract due to "a variety of issues with classroom management that directly impacted instruction" of students. ECF No. 66-2 ¶ 60, 73; ECF No. 63-1 ¶ 48. Mr. Bruno did not interview any students, and he discussed with Mr. Roberts and Mr. Donnelly whether anything could be done because the offending students could not be identified. ECF No. 66-2 ¶¶ 59, 64, 66. Additionally, Mr. Bruno contacted the superintendent for high schools at RCAN, but the organization did not provide any advice. *Id.* ¶¶ 61-62.

The following month, Plaintiff experienced another incident during class. In April 2018, Plaintiff reported to Mr. Roberts that a student had discussed "getting a cake" for Friday, and that during the discussion, it was revealed that Friday was Adolf Hitler's birthday. ECF No. 63-1 ¶ 50. After Plaintiff reported the incident, Mr. Roberts commenced an investigation, interviewing eight students. *Id.* ¶ 51; ECF No. 66-2 ¶ 67. Some students described witnessing anti-Semitic conduct, including the Nazi salute,

5

but Mr. Roberts did not request further description of what was perceived or who was responsible.  ECF No. 66-2 ¶¶ 26-27, 29, 68.  When the investigation was completed, SJR notified Plaintiff, encouraged him to come forward with any additional concerns, and confirmed that the swastika on Plaintiff's chalkboard was removed.  ECF No. 63-1 ¶¶ 52-54.  Plaintiff did not encounter other anti-Semitic conduct from the time of the incident through the end of the school year.  *Id.* ¶ 55.  However, a student found swastikas in at least "five out of seven" of his classrooms, even after Plaintiff left the school.  ECF No. 66-2 ¶¶ 30-31, 72.  Likewise, students found swastikas in bathrooms, refrigerators, a common hallway, and a wooden table in another classroom.  *Id.* ¶¶ 32-33.

As a result of his experiences, Plaintiff received therapy from a psychologist and became dependent on Xanax.  *Id.* ¶¶ 47, 50.  Although Plaintiff had described himself as a Catechumen and considered conversion to Catholicism when he applied for the job, his experiences steered him away from any such possibility.  *Id.* ¶ 51; ECF No. 63-1 ¶ 8.  After he left the job, Plaintiff attempted one more teaching position, but his fear of students led him to seek employment where he could avoid interaction, such as a night concierge position.  ECF No. 66-2 ¶ 51.

Ultimately, Plaintiff sued SJR and RCAN under Title VII and NJLAD for religious discrimination, unlawful retaliation, and a hostile work environment.  ECF Nos. 1, 3.  Thereafter, the parties stipulated to dismiss Plaintiff's religious discrimination and unlawful retaliation claims.  ECF No. 60.  With respect to the hostile work environment claim, Defendants moved for summary judgment under Federal Rule of Civil Procedure 56.  ECF No. 63.  Plaintiff opposed the motion, and Defendants replied.  ECF Nos. 66, 68.

## II.      LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute is genuine if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Lackey v. Heart of Lancaster Reg'l Med. Ctr.*, 704 F. App'x 41, 45 (3d Cir. 2017) ("There is a genuine dispute of material fact if the evidence is sufficient for a reasonable factfinder to return a verdict for the nonmoving party.").  Under this standard, "a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citations omitted).  At this stage, "the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Brooks v. Kyler*, 204 F.3d 102, 105 n.5 (3d Cir. 2000).

If a summary judgment motion is properly supported, then the nonmoving party cannot rest upon the pleadings, but "must counter with specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996).  For this reason, "a plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *see*

*also Huang v. BP Amoco Corp*, 271 F.3d 560, 564 (3d Cir. 2001) ("[T]he non-moving party must make a showing sufficient to establish the existence of each element of his case on which he will bear the burden of proof at trial.").  Ultimately, neither party can demonstrate that a fact is disputed or undisputed unless the party cites to "particular parts of materials in the record," or shows that "the materials cited do not establish the absence or presence of a genuine dispute, or that [the] adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

## III.   DISCUSSION

In this matter, there are genuine disputes of material fact that determine whether a hostile work environment existed under Title VII and the NJLAD.  Indeed, there are factual disputes that could affect the outcome of the suit under governing law and a sufficient evidentiary basis on which a reasonable jury could find for Plaintiff.  Accordingly, Defendants fail to show that there is no genuine issue for trial.

### A.   <u>Hostile Work Environment Under Title VII</u>

To establish that Defendants created a hostile work environment in violation of Title VII, Plaintiff must prove that he suffered "intentional discrimination" because of his religion, that the discrimination was "severe or pervasive," that the discrimination "detrimentally affected" him, that the discrimination would "detrimentally affect a reasonable person in like circumstances," and that SJR and RCAN are liable for the hostile work environment.  *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). To determine whether the discrimination was severe or pervasive, the factfinder must consider the "totality of the circumstances."  *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (citations omitted).  To assess whether the discrimination would detrimentally affect a reasonable person in like circumstances,

the factfinder must consider whether "a person in the protected category would be detrimentally affected by the conduct at issue." *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 280 n.10 (3d Cir. 2001). An employer is liable for a hostile work environment if it was negligent—that is, if it "knew or should have known about the harassment, but failed to take prompt and adequate remedial action." *Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007) (citations omitted).

### B.   Hostile Work Environment Under the NJLAD

To establish that Defendants created a hostile work environment under the NJLAD, Plaintiff must prove that the discrimination he suffered would not have occurred "but for" his religion, and that "a reasonable person of [his] religion" would consider the discrimination "to be sufficiently severe or pervasive to alter the conditions of employment and create a hostile working environment." *Cutler v. Dorn*, 955 A.2d 917, 924 (N.J. 2008) (emphasis omitted). Additionally, "the employer is liable only if management-level employees knew, or in the exercise of reasonable care should have known, about the campaign of harassment." *Heitzman v. Monmouth Cnty.*, 728 A.2d 297, 303 (N.J. Super. Ct. App. Div. 1999) (citations omitted). In other words, "when an employer knows or should know of the harassment and fails to take effective measures to stop it, the employer has joined with the harasser in making the working environment hostile." *Payton v. New Jersey Tpk. Auth.*, 691 A.2d 321, 326-27 (N.J. 1997) (citations omitted). Ultimately, "New Jersey courts treat hostile work environment claims under the NJLAD the same as the Supreme Court treats hostile work environment actions under Title VII." *Sgro v. Bloomberg L.P.*, 331 Fed. Appx. 932, 941 (3d Cir. 2009); *see also Lehmann v. Toys R Us, Inc.*, 626 A.2d

445, 452 (N.J. 1993) ("In construing the terms of the LAD, this Court has frequently looked to federal precedent governing Title VII of the Civil Rights Act of 1964 . . . .").

### C.    Genuine Issues for Trial

Defendants argue that any discrimination suffered by Plaintiff was not severe or pervasive, that a reasonable Jewish person would not have been detrimentally affected by the discrimination, and that SJR and RCAN cannot be held liable for the purportedly hostile work environment.  However, there are genuine issues for trial with respect to each argument.

### i.  Whether the Discrimination Was Severe or Pervasive

Defendants argue that any discrimination suffered by Plaintiff was "episodic" because it consisted of "sporadic acts of boorish conduct and offensive symbols," and was not "severe or pervasive in nature." ECF No. 63-2 at 28.  For example, Defendants argue that there is no evidence of anti-Semitic epithets, physical harassment, or social media harassment.  *Id.*  Defendants also argue that the chalkboard swastika pre-dated Plaintiff's employment and that the coin throwing was not necessarily intended as religious discrimination.  *Id.* at 26.

However, a reasonable jury could find that the swastikas, the other graffiti, the coin throwing, the *Schindler's List* reenactment, and the Hitler's birthday incident amounted to severe or persistent discrimination.  At least one student associated the coin throwing with Plaintiff's Jewish identity, and the swastika remained in Plaintiff's classroom despite numerous opportunities to address it.  Even if the

10

student's association cannot be imputed to the class and the swastika was never intended to be directed at Plaintiff, the remaining evidence is sufficient to create a genuine dispute of material fact.[2]

### ii. Whether a Reasonable Jewish Person Would Have Been Detrimentally Affected

Defendants argue that a reasonable Jewish person would not have been detrimentally affected by the discrimination because "the alleged perpetrators here were not the Plaintiff's colleagues, co-workers, or superiors, but were instead his students."  ECF No. 63-2 at 18; ECF No. 68 at 12.  Specifically, Defendants argue that the students were less mature than Plaintiff, that Plaintiff was responsible for maintaining discipline over the students, and that "Plaintiff's power and authority over [the] students strips their harassing conduct of much of its threatening character."  ECF No. 63-2 at 18-19.  Moreover, Defendants argue that "[t]here is no reported opinion of this District or the Third Circuit which has held that such claims are or may be viable, and none specifically authorizing such claims in the private or public school context grounded in student-on-teacher harassment."  *Id.* at 17-18.

Here too, a reasonable jury could find that the swastikas, the other graffiti, the coin throwing, the *Schindler's List* reenactment, and the Hitler's birthday incident would have detrimentally affected a reasonable Jewish person.[3]  Even if the source of the misconduct was students, it is not thereby

---

[2] The possibility that student misconduct was related to Plaintiff's gender identity, sexual identity, or classroom mismanagement merely reinforces the existence of genuine issues for trial.

[3] To the extent Defendants' argument is that the students did not detrimentally affect Plaintiff, the record is replete with indications to the contrary, including that Plaintiff received therapy from a psychologist, became dependent on Xanax, and developed a fear of students that led him to seek employment where he could avoid interaction.

inactionable "as a matter of law." *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 732 (7th Cir. 2009).[4]

Nor is the claim unviable; although the Third Circuit has not addressed the question directly, it has applied

the standard for hostile work environment to claims of student-on-teacher discrimination. *See Smith v.*

*Kelly Servs. Inc*, 802 Fed. Appx. 728, 729 (3d Cir. 2020).[5]   At the very least, the threatening character of

the graffiti and conduct is a material fact that is subject to genuine dispute.

### iii.   Whether SJR and RCAN Can Be Held Liable

Defendants argue that SJR and RCAN cannot be held liable for the purportedly hostile work

environment because Plaintiff provided no "basis for attributing to [Defendants] the alleged incidents of

harassment by his students." ECF No. 68 at 17.   As an initial matter, Defendants argue that Plaintiff had

regular contact with parents and administrators and regularly imposed discipline over student misconduct,

but that Plaintiff never mentioned anti-Semitism or reported discrimination until March 2018, despite the

policies and procedures that Defendants had in place.   *Id.* at 12-13; ECF No. 63-2 at 26, 30-31.

Additionally, Defendants argue that the administration removed the swastika and investigated the Hitler's

birthday incident after Plaintiff reported these issues, and that no further incidents occurred.  ECF No. 63-

---

[4] In *Lucero*, the Seventh Circuit found that student-on-teacher misconduct was inactionable because it was comprised of "isolated incidents" and there was "no [other] evidence to suggest that the students targeted [the plaintiff] because of her gender or national origin."  566 F.3d at 732.
[5] *See also Mongelli v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 491 F. Supp. 2d 467, 478 (D. Del. 2007) ("[L]iability for hostile work environment claims under Title VII may attach to schools that fail to address teachers' claims of harassment by students . . . ."); *Johnson-Harris v. AmQuip Cranes Rental, LLC*, 2015 WL 4113542, at *8 (E.D. Pa. July 8, 2015) (hostile work environment claims may be grounded in non-employee discrimination); *Armstead v. Executive Cleaning & Supply, Inc.*, 2014 WL 4659935, at *13–14 (M.D. Pa. Sept. 17, 2014) (same); *Guthrie v. Baker*, 583 F. Supp. 2d 668, 680 (W.D. Pa. 2008) (same).

2 at 30-31.  With respect to anti-Semitism outside of the classroom, Defendants argue that Plaintiff

produced no evidence that the administration was aware of any problems.  ECF No. 68 at 16.

However, there is sufficient evidence for a reasonable jury to find that Defendants knew or should

have known about the anti-Semitic incidents before any remedial action was taken.[6]  At least two teachers

and three administrators used or visited Plaintiff's class during the school year, but each apparently failed

to notice the swastika or the other anti-Semitic graffiti or conduct.  Likewise, students in other classes

discussed the coin-throwing incident and found numerous other swastikas outside Plaintiff's classroom,

which supports the notion that the administration was on notice about anti-Semitism before Plaintiff

reported the problems.[7]  Even if SJR had policies and procedures in place and promptly responded to

Plaintiff's request to address the issues, Defendants' response may have been inadequate; Mr. Bruno did

not interview any students in connection with the response, RCAN did not provide any advice about the

issues, and Mr. Roberts did not request further description of what was observed or who was responsible,

---

[6] Defendants argue that "affirmative defenses" are available to an employer who demonstrates that "the employee failed to take advantage of preventative or corrective policies provided by the employer, or to otherwise avoid the harm."  ECF No. 68 at 19.  But the affirmative defense applies to vicarious liability for supervisors, which is not synonymous with liability for negligence regarding the actions of co-workers or students.  *Clegg v. Falcon Plastics, Inc.*, 174 Fed. Appx. 18, 25 (3d Cir. 2006); *see also Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).  In any event, the credibility and legitimacy of Plaintiff's reasons for not reporting the anti-Semitism would create triable issues of fact.

[7] Defendants argue that "[a] hostile work environment claim cannot be based upon statements that are made outside of the presence of the plaintiff."  ECF No. 63-2 at 35.  But the conversations and graffiti outside of Plaintiff's classroom do not create a triable issue of fact as to whether Plaintiff suffered intentional discrimination that was severe or pervasive. Rather, "the anti-Semitic conduct outside of Plaintiff's classroom creates a triable issue of fact of how much anti-Semitism SJR was willing to tolerate among the students."  ECF No. 66 at 29.

even though the students he interviewed described witnessing anti-Semitic conduct.[8]   Thus, genuine disputes of material fact remain.

## IV.    CONCLUSION

For the reasons set forth above, the motion for summary judgement [ECF No. 63] is **DENIED**. An appropriate Order accompanies this Opinion.


s/ Julien Xavier Neals
DATED: May 23, 2023                **JULIEN XAVIER NEALS**
United States District Judge

---

[8] Plaintiff also disputes whether Mr. Roberts addressed the class about anti-Semitism, or whether he offered "an empty, off-hand approach that was completely devoid of any attempt to actually be effective." ECF No. 66 at 37-38.  Similarly, the content of Mr. Bruno's letter and the timing of SJR's decision to not renew Plaintiff's contract may suggest that Defendants' response was not "reasonably calculated to prevent further harassment."  *Knabe v. Boury Corp.*, 114 F.3d 407, 412 (3d Cir. 1997) (citations omitted). To the extent Defendants' response was limited because the offending students could not be identified— or because Plaintiff considered conversion to Catholicism, failed to discipline offending students, or suggested he was content—genuine issues exist for trial.